No. 25-1115

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————

UNITED STATES OF AMERICA,
APPELLEE

v.

SADEQ ALI QURAISHI,
DEFENDANT-APPELLANT

————————

ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

————————

BRIEF FOR THE UNITED STATES

————————

LEAH B. FOLEY
UNITED STATES ATTORNEY

DONALD C. LOCKHART
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3193

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................... ii

STATEMENT OF THE ISSUES........................................................1

STATEMENT OF THE CASE.............................................................1

    A.    Offense facts.....................................................................1

    B.    Procedural history............................................................4

SUMMARY OF ARGUMENT .............................................................6

ARGUMENT ........................................................................................7

I.    The jury selection claims are mainly waived, and there was no abuse of discretion or prejudice in any event................................................7

    A.    Introduction .......................................................................7

    B.    Procedural history of the jury selection issues.....................7

        1.    Juror 3.......................................................................7

        2.    Juror 7.....................................................................10

        3.    Juror 20 ...................................................................12

        4.    Juror 21 ...................................................................13

        5.    Juror 38 ...................................................................13

        6.    Juror 40 ...................................................................16

        7.    Juror 42 ...................................................................16

        8.    Juror 45 ...................................................................17

        9.    Juror 71 ...................................................................18

C.      Standard of review: waiver, forfeiture, abuse of discretion ...............19

D.      There was no plain error or abuse of discretion .................................21

E.      A final bar to reversal ...........................................................................25

II.     The instructional claims are waived, forfeited, and baseless ......................27

A.      Introduction .............................................................................................27

B.      Procedural history of the jury instruction issues ................................27

C.      The entrapment instruction claim.........................................................31

D.      The reasonable doubt instruction claim ...............................................34

III.    The claim that the district court erroneously limited the defense expert's
        testimony is waived, and there was no abuse of discretion or prejudice
        in any event...................................................................................................36

A.      Introduction .............................................................................................36

B.      Procedural history....................................................................................36

C.      The appellate claims are variously waived and meritless ..................40

D.      There was no prejudice ...........................................................................42

CONCLUSION......................................................................................................44

CERTIFICATE OF COMPLIANCE....................................................................45

CERTIFICATE OF SERVICE .............................................................................46

# TABLE OF AUTHORITIES

## CASES

*Amirault v. Fair*,
  968 F.2d 1404 (1st Cir. 1992) ...........................................................22

*Diaz v. United States*,
  602 U.S. 526 (2024) ..........................................................................42

*Ross v. Oklahoma*,
  487 U.S. 81 (1988) ............................................................................25

*Sampson v. United States*,
  724 F.3d 150 (1st Cir. 2013) .............................................................23

*Skilling v. United States*,
  561 U.S. 358 (2010) ..........................................................................20

*Smith v. Phillips*,
  455 U.S. 209 (1982) ..........................................................................21

*United States v. Abraham*,
  63 F.4th 102 (1st Cir. 2023) ..............................................................32

*United States v. Alzate*,
  70 F.3d 199 (1st Cir. 1995) ...............................................................34

*United States v. Ayala-Landor*,
  994 F.3d 73 (1st Cir. 2021) ...............................................................19

*United States v. Basilici*,
  __ F.4th__, 2025 WL 1482299 (1st Cir. May 23, 2025)....................32

*United States v. Bowman*,
  106 F.4th 293 (4th Cir.),
  *cert. denied*, 145 S. Ct. 426 (2024)..................................................26

*United States v. Burgos-Montes*,
  786 F.3d 92 (1st Cir. 2015) ......................................................... 21-22

*United States v. Chapdelaine,*
   989 F.2d 28 (1st Cir. 1993) ...................................................................20

*United States v. Chen,*
   998 F.3d 1 (1st Cir. 2021) .....................................................................40

*United States v. Christi,*
   682 F.3d 138 (1st Cir. 2012) ........................................................... 19-20

*United States v. Cleveland,*
   106 F.3d 1056 (1st Cir. 1997) ........................................... 27, 29, 34-35

*United States v. Correia,*
   55 F.4th 12 (1st Cir. 2022) .............................................................. 33-35

*United States v. Fields,*
   660 F.3d 95 (1st Cir. 2011) ...................................................................35

*United States v. Freeman,*
   70 F.4th 1265 (10th Cir. 2023) .............................................................26

*United States v. Gamache,*
   156 F.3d 1 (1st Cir. 1998) ................................................... 27, 31, 33

*United States v. Gladish,*
   536 F.3d 646 (7th Cir. 2008) ................................................................41

*United States v. Godfrey,*
   787 F.3d 72 (1st Cir. 2015) ................................................... 20, 22

*United States v. Gonzalez,*
   949 F.3d 30 (1st Cir. 2020) ............................................................. 23-24

*United States v. Gordon,*
   954 F.3d 315 (1st Cir.) ..........................................................................20

*United States v. Hite,*
   769 F.3d 1154 (D.C. Cir. 2014)............................................................42

*United States v. Hodge,*
   870 F.3d 184 (3d Cir. 2017) ................................................................26

iv

*United States v. Jones*,
674 F.3d 88 (1st Cir. 2012) ...............................................................35

*United States v. Kar*,
851 F.3d 59 (1st Cir. 2017) ......................................................... 20-22

*United States v. Kuljko*,
1 F.4th 87 (1st Cir. 2021) ...................................................... 20-22, 24

*United States v. Lowe*,
145 F.3d 45 (1st Cir. 1998) ......................................................... 24-25

*United States v. Martí-Lón,*
524 F.3d 295 (1st Cir. 2008) .............................................................22

*United States v. Martinez-Salazar,*
528 U.S. 304 (2000) .........................................................................25

*United States v. Melo*,
954 F.3d 334 (1st Cir. 2020) .............................................................35

*United States v. Monson,*
72 F.4th 1 (1st Cir.),
*cert. denied*, 144 S. Ct. 367 (2023)...................................................40

*United States v. Pedró-Vidal,*
991 F.3d 1 (1st Cir. 2021) .................................................................19

*United States v. Rathbun,*
98 F.4th 40 (1st Cir. 2024) ...................................................... 19, 32

*United States v. Soler-Montalvo,*
44 F.4th 1 (1st Cir. 2022) ......................................................... 42-43

*United States v. Soto*,
799 F.3d 68 (1st Cir. 2015) ...............................................................20

*United States v. Stokes*,
124 F.3d 39 (1st Cir. 1997) ...............................................................43

*United States v. Taylor,*
777 F.3d 434 (7th Cir. 2015)............................................................25

*United States v. Teixeira,*
  62 F.4th 10 (1st Cir. 2023) ...................................................................32

*United States v. Torres,*
  960 F.2d 226 (1st Cir. 1992) ........................................................ 20, 22

*United States v. Valdez,*
  88 F.4th 334 (1st Cir. 2023) ...............................................................40

*United States v. Wilson,*
  503 U.S. 329 (1992) ...........................................................................23

*Victor v. Nebraska,*
  511 U.S. 1 (1994) ................................................................................35

*Wainwright v. Witt,*
  469 U.S. 412 (1985) ...........................................................................20

*Williams v. Drake,*
  146 F.3d 44 (1st Cir. 1998) ........................................................ 22-23

### STATUTES AND RULES

18 U.S.C. § 1591(a)(1)............................................................................4

18 U.S.C. § 1591(b)(2)............................................................................4

18 U.S.C. § 1594(a) ................................................................................4

Fed. R. Crim. P. 30.................................................................................32

Fed. R. Evid. 704(a) ...............................................................................37

Fed. R. Evid. 704(b)..................................................................... 37, 41-42

## STATEMENT OF THE ISSUES

1.     The jury selection claims are mainly waived, and there was no abuse of discretion or prejudice in any event.

2.     The instructional claims are waived, forfeited, and baseless.

3.     The claim that the district court erroneously limited the defense expert's testimony is waived, and there was no abuse of discretion or prejudice in any event.

## STATEMENT OF THE CASE

### A.     Offense facts

As part of a Department of Homeland Security (DHS) operation focusing on people interested in paying for sex with children in the Boston area, agents posted an advertisement on a website that served as a hub for commercial sex transactions. [JA: 627-641].[1] The advertisement featured photos of two young women whose style of dress and poses were sexually suggestive but whose faces were obscured by emoji-like masks. [JA: 1069]. The title of the post conveyed what was on offer: "TIGHT, FRESH, and ready for FUN!!" [JA: 1069]. The body of the post was even more explicit: "Travelin thru town on a lil roadtrip! cum get me while you can . . . 2 beautiful flowers that are ready to bloom . . . NO BULLSHIT . . . NO COPS." [JA: 1069]. The contact phone number was 978-344-1833. [JA: 641, 1069].

---

[1] The joint appendix is cited as "JA:__", trial exhibits as "Ex.__", docket entries as "ECF__", and the defense brief as "Br.__."

On November 2, 2022, defendant viewed the advertisement on a website called Skipthegames, and at 12:44 p.m. he texted the contact phone number the following message: "Hey there—where around Boston are you hosting?" [JA: 645-646, 656, 786, 1070]. An undercover agent responded: "me and my girls are in waltham area tonigt. you wanna play[?]" [JA: 1070]. When defendant said he was headed in a different direction just then but might be interested at a later time, the agent replied: "well think about it. I got 14 yo [year old] Bri and 12 yo Jes. Def unique and so much fucking fun." [JA: 649-650, 1070]. After the agent assured defendant she was not a "cop," she explained "even they yunger they are fun and know what they doing," to which defendant replied: "Cool I appreciate that . . . backdoor [anal sex] is ok too?" [JA: 654, 1070]. The agent responded: "yeah it $50 and Bri the 14 yo is the only one that done that so far. jes may be to tight back there." [JA: 1070]. Defendant replied: "Got it—is Bri the one on the add?" [JA: 1070]. Agent: "she is the one in the black skirt yes." [JA: 1070].

After defendant said he was "interested" and received further assurances that the agent was "not involved with any law enforcement in any way" (his words), the following texts ensued, among others. [JA: 1070]. Defendant: "So the total for a visit with the backdoor is?" [JA: 1070]. Agent: "1 or both. how long[?]" [JA: 1071]. Defendant: "1 for hh [half an hour]." [JA: 1071]. Agent: "which one baby[?]" [JA: 1071]. Defendant: "I thought only one of them was able to do backdoor?" [JA:

1071]. Agent: "so that's Bri. She does do that. Half hour with her is $150, $50 extra for anal. so $200. If you doing bare [without a condom] it $250." [JA: 687, 1071]. Defendant: "Ok let's go for option #3 lol." [JA: 1071]. Agent: "LMAO [laughing my ass off]. So bare for $250. u clean right?" [JA: 658, 1071]. Defendant: "Yes!" [JA: 1071].

After the two discussed a plan to meet at a hotel in Waltham, defendant expressed concern about the fact that Bri was only 14, and the agent said she understood why he might want to back out and that he should "text later i[f] you change mind" to which he replied "Cool thanks." [JA: 1071-1072]. About ten minutes later, after having Googled the contact phone number along with search terms "escort" and "pooice" ("police"), defendant texted: "Ugh . . . man you're making things difficult—seems like a fun experience . . . just not in the mood to get arrested today." [JA: 665-668, 797-805, 1072]. After the agent assured defendant he would not be arrested, he said "Ok I'm on my way," and they agreed to meet at the Courtyard Marriott in Waltham, where "Bri is all ready for you." [JA: 1072].

Defendant and the agent met in the hotel parking lot about 3:00 p.m., and their conversation was recorded. [JA: 647-648, 669-670, 1074-1078; Ex. 6]. Among other things, they said the following to each other. Agent: "So my girl's up in the room." [JA: 1074]. Defendant: "Okay." [JA: 1074]. Agent: "I told her what you were like what you're in for." [JA: 1075]. Defendant: "Cool alright." [JA: 1075]. After

3

defendant agreed to leave the $250 in cash (which he displayed) in the room and promised that he would not engage in any "rough stuff" with Bri, "just normal shit," the agent handed him a room key and directed him to Room 148. [JA: 672, 747-748, 1075-1078]. The two agreed he should enter through a back entrance to the hotel so as not to attract attention. [JA: 1076-1077]. Defendant asked: "Do I just do I leave it [*i.e.*, the room key] to her [*i.e.*, "Bri"], or do I come back and give it to you?" [JA: 757, 1077]. The agent replied: "No no no you can just leave it in the room when you're done." [JA: 1077]. Defendant responded: "Okay alright cool okay." [JA: 1077]. As he began walking to the room, he was arrested. [JA: 673, 748].

On his person, defendant had the cellphone he had used to text with the agent and $250 in cash. [JA: 760, 771-772]. In his car, agents found his wallet, a second cellphone, and an empty box of condoms. [JA: 767-771]. Data extracted from the first cellphone revealed that defendant had sought and obtained commercial sex, including anal sex, many times in the past. [JA: 675-678]. There was no evidence of child pornography on his phone. [JA: 751-752].

## B. Procedural history

On November 10, 2022, a federal grand jury in the District of Massachusetts charged that defendant attempted to engage in a commercial sex act with a minor in interstate commerce in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and 1594(a). [JA: 21-23].

At a four-day trial that began on October 7, 2024, the government introduced the evidence just summarized. For his part, defendant called a psychiatrist to testify he was sexually interested in adults, not children. [JA: 842-887]. He then took the stand and admitted he had paid for sex with adults in the past and had viewed the advertisement posted by the undercover agents and texted the contact number. [JA: 890-911]. In the ensuing texts, he said, he initially thought the offer to have sex with 12-year-old Jes or 14-year-old Bri was a "scam," but as the texts progressed he became sure the offer was real and was "horrified" to learn that "two young children were being trafficked." [JA: 911-923]. He decided he had to "do something to intervene" and therefore drove to the hotel with the goal of trying to "rescue" them [JA: 923-942]—a story that was palpably perjurious and that did not weather well on cross-examination [JA: 957-981].

After deliberating for an hour and a half, the jury rejected the "rescue" defense and convicted defendant. [JA: 1053-1057].

On January 28, 2025, the district court (Kelley, J.) sentenced defendant to the mandatory minimum term of ten years. [JA: 17-18]. He timely appeals. [JA: 18].

On March 21, 2025, the district court granted defendant bail pending appeal, identifying as "substantial" issues a jurisdictional claim he has abandoned and the third issue he now raises on appeal. [JA: 19-20]. The court did not explain why either issue meets this definition.

# SUMMARY OF ARGUMENT

1.    Defense counsel expressly declined to strike for cause five of the nine jurors he contests on appeal, and the district court gave ample reasons for retaining the other four, all of whom were ultimately removed via peremptory strikes anyway. The Court need not explore whether the latter fact alone bars relief, and it may bypass waiver and forfeiture issues, because (a) the district court did not abuse its wide discretion and (b) the new "implied bias" theory is untenable.

2.    The instructional claims are waived, forfeited, and baseless. Beyond this, defendant (a) overlooks the fact that he received the key entrapment language he requested, and (b) ignores settled law holding that reasonable doubt need not be defined and that no particular words are required.

3.    The claim that the district court erroneously limited the defense expert's testimony is waived because defense counsel expressly stated multiple times that the expert would not offer an opinion that defendant had no intention of having sex with a minor on the day of the offense. Regardless, there was no abuse of discretion or prejudice, and defendant's appellate position on Rule 704(b) misreads the case law. Although Rule 704(b)'s clause barring an expert from opining on a defendant's intent does not apply to predicate facts from which a jury might infer such intent, the expert here was given wide latitude to marshal just such facts, and did so.

# **ARGUMENT**

## I. The jury selection claims are mainly waived, and there was no abuse of discretion or prejudice in any event

### A. Introduction

Defendant argues the district court was required to dismiss nine prospective jurors for bias even though: his trial counsel expressly declined to strike five of them for cause; the court gave ample reasons for retaining the other four, all of whom were ultimately removed via peremptory strikes anyway; he does not develop juror-specific arguments for finding an abuse of discretion; and he fails to address glaring waiver and forfeiture issues. [Br. 14-28]. The Court need not explore the procedural problems, however, because the district court did not abuse its wide discretion in any respect. Nor need the Court resolve whether relief is barred for the separate reason that none of the four jurors who were the subject of for-cause strikes were seated in the end.

### B. Procedural history of the jury selection issues

#### 1. Juror 3

In response to Question 9, concerning whether the fact of defendant's arrest and indictment would lead any juror to believe it was "more or less likely that he is guilty" [JA: 351], Juror 3 initially responded: "It just seemed like the circumstances that were presented, and given that it was an operation that was conducted, just

seemed it's more likely." [JA: 367]. When the court then asked "[d]o you have an open mind at this time?", she replied: "Yes." [JA: 367]. When the court asked "[d]o you think you could be fair and impartial and wait to decide this based on all the evidence in the case?", she again replied: "Yes." [JA: 367]. And when the court asked whether there was any "[h]esitation on your part?", she said: "No." [JA: 367].

In response to Question 12, concerning whether the nature of the allegations, including that defendant was alleged to have "discussed paying $250 to have unprotected anal sex with a 14-year-old girl," might "affect your ability to be fair and impartial in any way?" [JA: 353], Juror 3 responded: "I have a 14-year-old-daughter, so it's a little bit close to home." [JA: 367]. The court then asked whether it was "too close for you to be fair and impartial based on that reason?", and she replied: "I don't think so, no." [JA: 367-368]. The court probed further and asked Juror 3 to "help us understand your thoughts about this." [JA: 368]. Juror 3 replied, "Oh, it's just as a mother I have daughters, and it's obviously a difficult topic," but then answered "Yes" when the court inquired if she could "set that aside and evaluate the evidence—decide this case solely on the evidence and not consideration of your . . . daughter's age." [JA: 368].

In response to Question 24, concerning whether any juror or close friend or family member had been a victim of, or had been accused of committing, "sexual assault, abuse, trafficking, or other misconduct," or had "worked for or associated

8

with any organization related to child abuse, sexual abuse, or human trafficking?" [JA: 358-359], Juror 3 disclosed that she had been a victim of sexual assault. [JA: 368]. When the district court asked if there was "[a]nything about that fact that would make it difficult for you to be fair and impartial in this case?", she answered: "No." [JA: 368]. Juror 3 also revealed she had donated money to organizations that helped "abused women," but said "Yes" when asked if she would "be able to separate your personal experiences from the facts of this case?" [JA: 368-369].

Under defense questioning, Juror 3 said she had initially thought it was more likely defendant was guilty given that the case had involved a "sting operation," but she affirmed that (a) notwithstanding the court's description of the alleged offense, she did not "lean in favor of the government or the defense at this time," (b) she could "keep an open mind and be critical, if necessary, of the government witnesses," (c) she would be "open-minded" about any defense to the charge, and (d) she had not concluded defendant was guilty. [JA: 369-370].

When defense counsel moved to strike Juror 3 for cause based on her responses to all three questions, the government noted among other things that she had "candidly raised her hand" when asked about the sting operation but on inquiry "she had no hesitation that she could be fair and impartial," and had answered similarly when asked follow-up questions on the other issues. [JA: 371-372]. The court denied the motion to strike, finding: "I appreciate all the points that you point

out, Counsel, but she was pretty clear that she could be fair and impartial irrespective of those facts about her personal experiences." [JA: 372].

Defense counsel used a peremptory strike to remove Juror 3. [JA: 571].

### 2.    Juror 7

Juror 7 reported that her two sisters had been sexually assaulted when they were children and that she had "experienced a sexual encounter" while "on a study abroad." [JA: 380]. When the court asked if there was "[a]nything about those experiences that would prevent you from being a fair and impartial juror in a case like this?", she answered: "I would like to say not." [JA: 380]. The court then queried: "Hesitation on your part?" [JA: 380]. Juror 7 replied: "I think it's less about—well, maybe less about the experiences, but it's something about the sting operation and like—that's one of the questions you asked earlier was if I felt he was more likely to be guilty because of that. I don't know, it's like something that's in my head. I'm not sure if I feel like he's more likely or less likely, but the circumstances are hard to wrap your head around, I guess I'd say." [JA: 380]. After confirming she understood that defendant was presumed innocent and that the government had the burden of proof beyond a reasonable doubt, Juror 7 answered "No" when asked "[a]t this point in time with just the limited information that I provided you about the case, do you feel like you lean in favor of one side versus the

other before you've heard actual evidence in the case?", and "Yes" when asked "[d]o you think you could be fair and impartial?" [JA: 380-381].

When defense counsel pressed Juror 7 on whether she thought people arrested as part of a sting operation were probably guilty, she responded: "I mean, I don't know—like, I don't know all the details, but I think it's—I don't know. I don't know if they would be more likely to be guilty, but a specific plan was put into place to catch people like that, and I would think it would be thought out." [JA: 382]. After confirming she did not know anything about "how the operation was run" or what defendant "did or didn't do," Juror 7 answered "No" when asked "[s]o without knowing all of that information, are you able to say you're more or less likely to believe the defendant's guilty?" [JA: 382-383]. When the court inquired "[i]s there anything else that you think we should know about you as we evaluate whether or not this is the right case for you?", Juror 7 said: "Nope, I don't think so." [JA: 383].

After hearing from the lawyers [JA: 385-386], the court denied the defense motion to strike Juror 7, finding:

> She clearly responded with regards to her sisters' experience that she could be fair and impartial. With regards to the sting operation, we asked the jurors to be candid and share these thoughts with us for us to dig a little bit deeper. And understanding what this case is going to be about, it's really challenging whether or not there was a good plan. And so she was open-minded, and I think that—I'm convinced that she can be a fair and impartial juror, so I'm denying the request.

[JA: 386].

Defense counsel used a peremptory strike to remove Juror 7. [JA: 571].

### 3. Juror 20

When asked whether defendant's arrest and indictment made him more or less likely to be guilty, Juror 20 initially responded that "[w]here there's smoke, there's fire," but then clarified that this did not "make him more likely than me to be guilty," that she had "no idea" whether he was guilty, and that "it all hinges on everything else that's presented at trial" and "I have no idea what else I'm going to hear over the course of the next few days." [JA: 418-419]. In response to Question 12, concerning whether the graphic nature of the allegations would affect her ability to be impartial, Juror 20 stated: "It's kind of a gut check for me. I don't know. I can't say that I would make it less likely for me to be fair. The circumstances of the case were—I kind of had a visceral reaction to it. But again, all of that set aside based on all the evidence that comes after." [JA: 419]. The court followed up: "Are you able to set it aside?" [JA: 419]. Juror 20 responded: "I'm a pretty pragmatic person, so honestly, I would say yes." [JA: 419]. She also stated that although the nature of the charges "took my breath for a minute," this was "pretty irrelevant" and "[w]hen it comes down to it, everything starts clean slate at the beginning of a case." [JA: 419].

When the court asked the lawyers whether they had any questions for Juror 20, both said no. [JA: 420]. And when the court inquired of defense counsel "[a]ny for cause challenge?", he replied: "No, Your Honor." [JA: 420].

12

### 4. Juror 21

Juror 21 said that "it's a very egregious crime if true" but that she was "always willing to hear everything" and would have to "hear the whole story." [JA: 422]. She disclosed that she "had a close friend [who was] a victim of a sexual assault" but affirmed this would not prevent her from being impartial. [JA: 422]. She also agreed that defendant was innocent until proven guilty, stated that "it would be beyond a reasonable doubt before I would say guilty," and confirmed that she would "base [her] decision purely on evidence that was presented at trial." [JA: 423-424]. Under defense questioning, Juror 21 conceded the charges were "disturbing" and a "very negative thing" but said that this "wouldn't distract [her] from listening to the whole story," that she did not "have any evidence at this point," and that "[j]ust being charged doesn't mean you're guilty until there is evidence." [JA: 424-425]. She also answered "Yes" when the court asked "[d]o you think that you would be able to objectively receive the testimony of witnesses and decide whether you believe them or not?" [JA: 425].

When the court asked "[a]ny for cause challenge?", defense counsel replied: "No." [JA: 426].

### 5. Juror 38

After Juror 38 revealed that two of his daughters had been sexually assaulted so the case "strikes a chord," the court inquired: "Do you think that you would be

13

able to keep that separate, those emotions that you're feeling and those thoughts about it, from evaluating the evidence here in this case?" [JA: 464]. Juror 38 replied: "I think so." [JA: 464]. When the court pursued the point by asking whether there was any "[h]esitation on your part?", he responded: "I guess maybe a little. But I recognize that—well, I guess it's hard to find words but—I think I could, yes." [JA: 464]. On further inquiry, Juror 38 described the prior sexual assaults: "For my oldest daughter, who is now 31—I'm sorry. It's hard to talk about. She was five at the time. My other daughter, who's my youngest daughter now, she was 14. One for my oldest daughter, it was an adult, and it was the father of her friend. And for my youngest daughter it was another high school student." [JA: 464-465]. Juror 38 then confirmed more generally that he could be impartial despite defendant's arrest ("that doesn't necessarily define the guilt") and the nature of the charges ("I would need to know more of the facts of the matter"). [JA: 465-466].

Under defense questioning, Juror 38 admitted that answering the questions on this topic was "a bit difficult because I had experience" [JA: 466], but when asked whether the prior incidents with his daughters "would bother [him] during the course of the trial or that [he] would be thinking about [them] . . . knowing what this case is about?", he responded: "I don't—I don't think so. Again, that question—the other question really struck a chord and brought back a lot of memories. I guess the answer

is I don't think it would stop me from trying to be fair and be—you know, stick to what the law was as it's defined and the evidence is." [JA: 466-467].

Defense counsel moved to strike Juror 38 for cause on the basis of his "emotional response" to the questioning and the concern that his prior experience would "distract from his ability to . . . pay attention to the evidence . . . and could also frankly affect other jurors around him." [JA: 468]. The government acknowledged that Juror 38's initial answer was emotional but noted the thoughtful and insightful nature of his responses thereafter. [JA: 469].

The court denied the motion to strike, finding as follows:

> So let me state for the record that he was visibly—when he reflected on question 24 in particular, he became visibly teary-eyed and emotional, even his speech became hesitant. I thought he was very thoughtful in his responses, and I thought that he was committed to being earnest to his responsibilities.

> I do think that there is a slight difference between him and a prior juror that I believe I excused, that he convinced me that he was able to perform the duties of a juror by separating that. And I do think that they are a bit different circumstances of his daughters' experiences and this case. I did also contemplate the effect that if it somehow triggered him to become emotional during deliberations how that might affect other jurors, and I am—I think that there is enough nuance and sophistication in his ability to separate those things that I'm going to leave him on the jury at this point in time.

[JA: 469-470].

Defense counsel used a peremptory strike to remove Juror 38. [JA: 573].

### 6. Juror 40

Juror 40 stated she had been the victim of "[s]exual abuse and rape" 27 years earlier but affirmed she could be "fair and impartial," that she could "separate [her] personal experiences from [her] evaluation of th[e] case," and that she did not "lean in favor of one side or the other." [JA: 472-475]. Defense counsel asked whether, "when you heard what the allegations in this case were, did that make you at all think about what happened to you?", and she answered: "No." [JA: 476].

When the court asked whether there was "[a]ny for cause challenge?", defense counsel replied: "No." [JA: 476].

### 7. Juror 42

Juror 42 said that the fact that defendant was charged with a crime made it "a little bit" more likely that he was guilty since "there must be some factors that he was brought here for," but went on to confirm that he would base his decision on the trial evidence, that he would follow the court's instruction that the indictment is not evidence, that he would impartially weigh the evidence, and that he would hold the government to its burden of proof beyond a reasonable doubt. [JA: 483-484]. He also stated that the fact that his nephew was the victim of sexual abuse would not prevent him from being impartial. [JA: 482].

When the court inquired whether there was "[a]ny for cause challenge?", defense counsel said: "No." [JA: 484].

### 8.  Juror 45

Juror 45 initially stated she had "some" hesitation about whether she could be impartial given "the sexual nature" of the charge, but went on to confirm that she did not "lean in favor of one side versus another," that she could be "critical" in evaluating the evidence, and that she accepted the presumption of innocence and would "hold the government to the burden of proof." [JA: 489-490]. Under defense questioning, Juror 45 acknowledged it "could" be difficult to hear "testimony about graphic sexual acts," that this "could" potentially "distract [her] from [her] ability to listen to the evidence," and that it was "possible" this "might make it more difficult for [her] to kind of fairly gauge what the evidence is." [JA: 491]. She then said that "I would do my best to be as impartial and as, you know, open to hearing all the evidence," and confirmed she did not have any "serious concerns" about her "ability to consider the evidence." [JA: 491]. She thereafter clarified that, although she had "some" concerns about being "distracted by the content" of the evidence in the sense of potentially "being inattentive" since "the mind wanders because it doesn't want to listen something, which obviously is not the best, but I'm just trying to be as honest as possible," she answered "No" when asked whether "the potential graphic nature of the evidence, would that alone make you decide one way or the other?" [JA: 491-492].

In moving to strike Juror 45, defense counsel said that while he thought she "could fairly judge the case" despite the graphic nature of the evidence, he was worried that such evidence might cause her "to tune out and not necessarily want to hear it." [JA: 492-493]. The court denied the motion, finding:

> I'm going to deny the request for a for cause excusal. Initially, in looking at her, I had concerns because I almost thought that she was looking at me for some affirmation of her responses but then she moved away from that and solidly represented her positions and views independently. So I did not carry that same concern, which is completely different from the issue that you're raising.

> With regards to potentially distracting, I think everyone becomes a little bit inattentive for a moment, and I think that she will understand the significance and importance of any messages, and so I don't think it's going to cloud her ability to be fair and impartial.

[JA: 493].

Defense counsel used a peremptory strike to remove Juror 45. [JA: 573].

### 9. Juror 71

Juror 71 said she had been sexually assaulted but that she could be impartial. [JA: 566]. When defense counsel asked, "[w]hen you heard the allegations in this case, did that at all make you think of the incident that happened to you?", she responded: "No." [JA: 566].

When the court asked whether there were "[a]ny for cause challenges?", defense counsel said: "No." [JA: 567].

18

### C.      Standard of review: waiver, forfeiture, abuse of discretion

 In his opening brief, defendant begins by explaining the importance of jury selection. [Br. 15-16]. Next, he devotes four pages to an abstract discussion of the distinction between actual and implied juror bias, taking care not to discuss any of this Court's opinions on that subject. [Br. 16-19]. After this, he spends three pages citing "studies" supporting his belief that prospective jurors with "traumatic past experiences" that relate in some fashion to the expected subject matter of a trial will not be able to set aside their biases and cannot be trusted when they affirm that they will be impartial. [Br. 19-21]. Under a subsection titled "Jurors With Obvious Bias Were Not Struck For Cause," he finally addresses the procedural history of the nine jurors while skimming over the fact that his counsel elected not to strike five of them for cause. [Br. 21-28]. Apart from the quoted title, there is no developed argument as to why the district court erred in not striking particular jurors. [Br. 22-28].

It follows the Court could hold defendant's treatment of these issues on appeal amounts to waiver. *See, e.g., United States v. Rathbun*, 98 F.4th 40, 58 (1st Cir. 2024); *United States v. Ayala-Landor*, 994 F.3d 73, 75 n.2 (1st Cir. 2021); *United States v. Pedró-Vidal*, 991 F.3d 1, 6 n.5 (1st Cir. 2021).

There is a further waiver problem. The issue whether the defense wished to strike prospective jurors for cause was "unmistakably on the table" below, *United States v. Christi*, 682 F.3d 138, 142 (1st Cir. 2012), yet five times counsel told the

court pointblank that he did *not* want to pursue a for-cause dismissal of the juror. [*Supra* 12-13, 16, 18]. It would be hard to find a clearer example of waiver. *See, e.g.*, *United States v. Soto*, 799 F.3d 68, 96 (1st Cir. 2015); *Christi*, 682 F.3d at 142. At best, the appellate claims with respect to these five jurors are forfeited and review is for plain error. *See United States v. Chapdelaine*, 989 F.2d 28, 31-32 (1st Cir. 1993); *United States v. Torres*, 960 F.2d 226, 228 (1st Cir. 1992). But the result is the same even under the untenable assumption that all the voir dire issues are preserved. *See United States v. Kuljko*, 1 F.4th 87, 92 (1st Cir. 2021) (citing *Soto* and *Chapdelaine* in warning that "it is quite likely that the appellant's challenge (or at least some aspect of it) was either waived or forfeited," but bypassing the issue since the voir dire claims failed even if "fully preserved").

Even where jury selection claims are preserved, juror credibility assessments are "peculiarly within a trial judge's province," *Wainwright v. Witt*, 469 U.S. 412, 428 (1985), and "the deference due to district courts is at its pinnacle" in this setting, *Skilling v. United States*, 561 U.S. 358, 396 (2010). Hence, this Court reviews such rulings for a "clear abuse of discretion." *United States v. Godfrey*, 787 F.3d 72, 81 (1st Cir. 2015); *accord Kuljko*, 1 F.4th at 93; *United States v. Gordon*, 954 F.3d 315, 324 (1st Cir. 2020); *United States v. Kar*, 851 F.3d 59, 68 (1st Cir. 2017). There was no such abuse here.

### D. There was no plain error or abuse of discretion

It bears noting at the outset that defendant "finds no fault with the scope of the district court's interrogation of" any of the nine prospective jurors. *Kuljko*, 1 F.4th at 93. Rather, "[h]e argues instead that [their] answers to the court's questions somehow require a finding that [they were] either actually or impliedly biased." *Id.* Since he appears to focus on the wholesale claim that people who have previously experienced a form of trauma that relates in some way to the expected trial evidence can never set aside any biases they may have and must always be struck for cause, the government addresses that—unpreserved—implied bias argument first.

The new implied-bias theory—if defendant is pursuing one—is baseless under any standard of review. Implied bias exists only in the most "exceptional" or "extreme" circumstances. *United States v. Burgos-Montes*, 786 F.3d 92, 111 (1st Cir. 2015); *accord Kuljko*, 1 F.4th at 93; *Kar*, 851 F.3d at 68. Justice O'Connor noted *possible* examples: (1) where "the juror is an actual employee of the prosecuting agency"; (2) where "the juror is a close relative of one of the participants in the trial or the criminal transaction"; or (3) where "the juror was a witness or somehow involved in the criminal transaction." *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring); *Kuljko*, 1 F.4th at 93 (citing these examples); *Kar*, 851 F.3d at 68 (same).

Applying these principles, this Court has rejected every implicit bias claim it has ever encountered as far as the government can tell. *See Kuljko*, 1 F.4th at 93 (no implied bias where juror's coworker's husband was an AUSA involved in the case); *Kar*, 851 F.3d at 64, 68 (no implied bias where juror was a "'[f]amily friend'" and babysitter for a paralegal on the prosecution team who helped present the case in court, and where her sister babysat for the paralegal "'pretty frequently'"); *Burgos-Montes*, 786 F.3d at 110-111 (no implied bias where juror was second cousin of defense witness); *Godfrey*, 787 F.3d at 80-81 (no implied or actual bias where juror received a mailing much like the mailing received by the victims in the fraud trial, she opined she was "probably a target" in that instance, and she responded "I don't know" and "I don't think so" when asked if this experience would bias her); *Torres*, 960 F.2d at 228 (no plain error in retaining juror who was acquainted with brother of prosecutor); *Amirault v. Fair*, 968 F.2d 1404, 1406 (1st Cir. 1992) ("[T]he situation presented here of a juror found to have blocked the memory of an unrelated forty-year-old rape does not rise to the level of 'exceptional' or 'extreme' circumstances which may permit a finding of implied bias."); *see also United States v. Martí-Lón*, 524 F.3d 295, 299 (1st Cir. 2008) (juror properly retained even though he read a newspaper article that parroted the government's trial theory and evidence and he said "in essence" that "the article was the truth"); *Williams v. Drake*, 146

F.3d 44, 49-51 (1st Cir. 1998) (juror properly retained although he told court officer he thought "the accused might be involved in [a] celebrated murder").

Defendant cites no decision of this Court holding that implied bias exists in every case where a prospective juror once experienced trauma—sexual or otherwise—that has a connection to the expected trial evidence.[2] This is hardly surprising given that, were this so, large swathes of the citizenry would be excluded from jury service in cases where they, family members, or friends were victims of conduct bearing some resemblance—however remote—to the charged crimes. And logically, defendant's rule would extend beyond sex-related crimes to all manner of criminal conduct, such as fraud offenses. His position here is absurd. *See United States v. Wilson*, 503 U.S. 329, 334 (1992) ("[A]bsurd results are to be avoided."). In any event, because he cites no controlling authority for his new implied bias theory, there can be no claim of "obvious" error. *See United States v. Gonzalez*, 949

---

[2] To be sure, this Court has noted that "[w]hen a juror has life experiences that correspond with evidence presented during the trial, that congruence raises obvious concerns about the juror's possible bias." *Sampson v. United States*, 724 F.3d 150, 167 (1st Cir. 2013). But the Court made that observation in the context of holding that a juror should have been struck for *actual bias* based on three factors: "(i) Juror C's habitual dissembling; (ii) the intense emotions Juror C exhibited when belatedly relating her life experiences involving P and J; and (iii) the similarities between Juror C's unreported life experiences and the evidence presented during the penalty-phase hearing." *Id*. With respect to the first factor, the Court was particularly concerned with the fact that "Juror C lied repeatedly in the voir dire questionnaire and directly to the court," reasoning that this was "a powerful indicator of bias." *Id.*

F.3d 30, 39 (1st Cir. 2020) (appellate claim is "'not within a country mile of plain error' when no controlling precedent exist[s].").

Any *actual* bias claim likewise fails. "Where, as here, the district court has had the opportunity to question the challenged juror and to see and hear her responses in real time, the party who challenges the court's decision to allow the juror to sit ordinarily faces an uphill climb." *Kuljko*, 1 F.4th at 93.

Defendant does not even start this hike, and he cannot reach the summit. Jurors 20 and 45 did not say they or anyone close to them had been the victim of a sexual assault. [*Supra* 12, 17]. Moreover, for all nine prospective jurors, the district court and the lawyers probed possible biases, especially when any hesitation or red flags arose. [*Supra* 7-18]. In the four instances of for-cause motions to strike, the court was careful to explain why it found the jurors' expressions of impartiality credible based on the content and quality of their responses and in some cases their demeanor or delivery. [*Supra* 9-11, 15, 18].

This case thus resembles *United States v. Lowe*, 145 F.3d 45 (1st Cir. 1998), where the Court affirmed "the district court's refusal to strike for cause two prospective jurors, one of whom had been sexually molested and the other who had been the victim of an attempted rape," in a case where the defendant was charged with raping a young woman, *id*. at 48. And while defendant—oddly enough—calls attention to Jurors 2 and 4 [Br. 21 n.2], the district court struck both [JA: 365-366,

372-375], which if anything only underscores the discriminating character of its jury selection. *See Lowe*, 145 F.3d at 49.

### E.     A final bar to reversal

Since there was no abuse of discretion, the Court need not address a final bar to reversal it has bypassed before. *See Lowe*, 145 F.3d at 49 ("Because the district court did not abuse its discretion in denying the defendant's motions to exclude jurors number 18 and 19 for cause, we need not reach the question whether Lowe's use of two of his peremptory challenges for these jurors mandates reversal.").

As the Seventh Circuit has observed, "the Supreme Court [has] held that the defendant's right to an impartial jury is not violated when he uses a peremptory challenge to strike a juror who should have been removed for cause." *United States v. Taylor*, 777 F.3d 434, 440 (7th Cir. 2015) (Sykes, J.) (citing *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988)). This is because "[t]he loss of a peremptory challenge is neither a constitutional violation nor violates any rule-based right." *Taylor*, 777 F.3d at 440 (citing *Ross*, 487 U.S. at 86). Instead, "[t]he defendant's Sixth Amendment right to an impartial jury is vindicated so long as the jury that actually sits is impartial." *Taylor*, 777 F.3d at 440 (citing *Ross*, 487 U.S. at 88); *see also United States v. Martinez-Salazar,* 528 U.S. 304, 313-18 (2000) ("We answer today the question left open in *Ross* and hold that a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant

chooses to use a peremptory challenge to remove a juror who should have been excused for cause."); *United States v. Bowman*, 106 F.4th 293, 304 (4th Cir.), *cert. denied*, 145 S. Ct. 426 (2024); *United States v. Freeman*, 70 F.4th 1265, 1287 (10th Cir. 2023); *United States v. Hodge*, 870 F.3d 184, 203 (3d Cir. 2017).

As defendant himself notes [Br. 28], his counsel used peremptory strikes to dismiss all four prospective jurors he had unsuccessfully moved to strike for cause: Jurors 3, 7, 38, and 45. [JA: 571, 573]. His new appellate challenges to the remaining five (Jurors 20, 21, 40, 42, and 71) are waived and meritless for reasons discussed above.[3] Thus, there is no viable path to relief even if one assumes the district court abused its discretion in initially retaining one or more of the four jurors who were the subject of failed for-cause motions to strike but who were ultimately struck on a peremptory basis. On this record, there is simply no reason to believe the *seated jury* was biased in any way, shape, or form.

---

[3] Defense counsel used peremptory strikes to dismiss Jurors 20 and 21, further undermining any conceivable claim of prejudice. [JA: 571].

**II. The instructional claims are waived, forfeited, and baseless**

    **A.    Introduction**

Defendant's challenges to the phrasing of the entrapment and reasonable doubt instructions are variously unpreserved and insubstantial, and there was no abuse of discretion regardless. He overlooks the fact that the district court ultimately gave him the key entrapment language he requested. And he ignores settled law holding that reasonable doubt need not be defined and that no particular words are required.

    **B.    Procedural history of the jury instruction issues**

On September 16, 2024, defendant filed a proposed jury charge on the reasonable doubt standard that included language drawn from a district court instruction quoted in *United States v. Cleveland*, 106 F.3d 1056, 1062-63 (1st Cir. 1997). [JA: 27-28]. He also requested an entrapment instruction that included language lifted from *United States v. Gamache*, 156 F.3d 1, 9, 11 (1st Cir. 1998). [JA: 29-30]. This proposed instruction stated that, as to the first element of entrapment, the government was required to prove "that the government agents did not improperly persuade or talk [defendant] into committing the crime," and it went on to discuss the concept of "improper inducement." [JA: 29].

The same day, the government submitted proposed instructions on the offense elements, and it asked the district court to use the First Circuit Pattern Instructions on the remaining topics, including the reasonable doubt standard. [JA: 32-36].

On September 23, the government filed an objection to defendant's proposed instructions arguing that there was no basis for giving an entrapment instruction and that the court should use the First Circuit Pattern Instructions on the reasonable doubt standard. [JA: 101-115].

On September 24, the defense filed a memorandum arguing that an entrapment instruction was appropriate. [JA: 172-182].

On October 2, the government filed proposed supplemental jury instructions asking that, if the district court were inclined to give an entrapment instruction, it use the First Circuit Pattern Instructions on entrapment as well as language adapted from a Ninth Circuit pattern instruction: "Law enforcement agents may engage in stealth and deception, such as by undercover agents using false names and appearances and assuming the role of members in criminal organizations." [JA: 213-216].

At a pretrial conference later that day, the district court asked defense counsel what his position was on the government's proposed entrapment instructions. [JA: 268]. Counsel replied that he preferred his own since the *Gamache*-based language "gives a much more thorough explanation of the factors upon which the jury can

find when considering lack of predisposition," but he added: "Ultimately I'll defer to the Court. I just suggest that the language I included in my proposed instruction explains it a *bit more* for the jury." [JA: 268 (emphasis added)]. The government then explained why the court should employ its own proposed instructions. [JA: 273-274]. Defense counsel responded that he did not "have an issue necessarily" with the government's instructions, while conceding even the defense instructions contained language acknowledging that "a sting operation is not improper." [JA: 274]. The government then noted that the entrapment-related language in *Gamache* was not intended by this Court for use in jury instructions. [JA: 275-277]. The court said it was inclined to "default to the pattern instruction" but would consider the matter further. [JA: 277].

At an October 4 pretrial hearing, the government objected to the proposed defense instruction on reasonable doubt containing text from *Cleveland*, noting that some of the defense language could not be found in that decision and the court should simply steer by the First Circuit Pattern Instructions. [JA: 323-326]. The defense argued in favor of the *Cleveland* wording. [JA: 324-325]. The district court indicated it was inclined to use the reasonable doubt standard in the First Circuit Pattern Instructions but said it would circulate a final draft of its instructions before the charge. [JA: 324-325]. It also indicated it was inclined to use the First Circuit Pattern

Instructions on entrapment along with the additional Ninth Circuit language, but that it was "still working on the instructions." [JA: 329-330].

On October 6, the government filed a revised proposed instruction on entrapment asking the district court to add the word "improperly" to a sentence concerning the first element of entrapment: "<u>One</u>, that the agents did not *improperly* persuade or talk the defendant into committing the crime." [JA: 222-223]. The proposed defense instruction contained the same "improperly" qualifier in describing this first element. [JA: 29; *supra* 27].

At the outset of the third trial day on October 9, the district court noted it had distributed its close-to-final instructions to the parties, and that it was marked as a court exhibit. [JA: 702, 1222-1232]. The government said "the parties agree that the presumption of innocence, proof beyond a reasonable doubt instruction as proposed by the Court is fine" [JA: 703], but defense counsel interjected: "If I could, just for the record, I did propose a different reasonable doubt instruction. I just want that noted for the record. I understand Your Honor is intending to give the model and so I don't have an issue with the language that's included here, just to be clear." [JA: 703]. On the entrapment instruction, the court observed that it had already included the word "improperly" in describing the first element and that it had since added that word "on the second line of the first paragraph" [JA: 706], as the close-to-final [JA: 1225] and final [JA: 1231] instructions circulated by the court both reflect. Defense

counsel did not fault this tweak. [JA: 706-709]. In addition, the close-to-final and final entrapment instructions now included the six *Gamache*-based factors relevant to predisposition that the defense had requested. [JA: 30, 1225-1226, 1231].

In its jury charge the next day, the district court gave a lengthy instruction on reasonable doubt, describing it as "a cardinal principle of our system of justice" and "a heavy burden." [JA: 1043]. The court also gave a lengthy instruction on entrapment [JA: 1046-1048], using the word "improperly" in the second sentence as it had forecasted [JA: 1046] and in defining the first element as both sides had proposed [JA: 1047]. In line with its close-to-final and final drafts [JA: 1225-1226, 1231-1232], the court instructed on the six *Gamache*-based predisposition factors [JA: 1047-1048], as the defense had requested [JA: 30].

In the wake of the charge, defense counsel intoned: "For the record, I just want to preserve my objections to the reasonable doubt instruction and entrapment instruction I presented previously." [JA: 1052]. He said nothing further.

## C. The entrapment instruction claim

Defendant's lengthy procedural history focuses on subtle distinctions between the different versions of the First Circuit Pattern Instructions cited below, to no evident purpose. [Br. 29-40]. By contrast, his lead entrapment instruction argument [Br. 40-41] is terse: that the district court should not have inserted the word "improperly" in the second sentence of its entrapment instruction, where it said that

31

"[a] person is entrapped when he or she is improperly induced or persuaded by law enforcement officers or their agents to commit a crime that he or she was not otherwise ready and willing to commit." [JA: 1046].

Defendant's three-sentence argument on this point [Br. 41], unsupported by any citations, is perfunctory and thus waived. *See United States v. Teixeira*, 62 F.4th 10, 21 (1st Cir. 2023). Moreover, because defendant did not fault the instructions on this ground below, and indeed appeared to acquiesce in the district court's decision to insert the word "improperly" here [*supra* 30-31], the issue is at best forfeited and subject to plain-error review. *See* Fed. R. Crim. P. 30; *United States v. Basilici*, __ F.4th__, 2025 WL 1482299, at \*7 (1st Cir. May 23, 2025); *United States v. Abraham*, 63 F.4th 102, 109-110 (1st Cir. 2023). And since defendant does not attempt to satisfy that standard, his appellate claim is waived for a second reason. *See Rathbun*, 98 F.4th at 58.

Regardless, there was no error, let alone obvious error. The defense expressly agreed in its proposed instructions that the inducement must be "improper," and it included that qualifier in its own definition of the first entrapment element. [JA: 29]. It is unclear how it could be plain error merely to use the word a second time, at the outset of the instructions. Contrary to defendant's suggestion, the use of the word there did not shift any burden or convey to the jury that "the defense must show that it was an *improper* inducement." [Br. 41 (emphasis in original)]. The court in fact

made abundantly clear that the *government* had to disprove entrapment beyond a reasonable doubt, and that this burden included proving "that the agents did not improperly persuade or talk defendant into committing a crime." [JA: 1047]. The new defense theory here is baseless.

Defendant's second perfunctory claim is that "the final instruction did not integrate any of the defense's proposed language from First Circuit law." [Br. 41]. That is untrue. The district court included the six *Gamache*-based predisposition factors just as the defense had requested.[4] The failure to "integrate" claim is otherwise undeveloped. There was no error, let alone an abuse of discretion, even putting aside the unpreserved nature of the claim. *See United States v. Correia*, 55 F.4th 12, 41 (1st Cir. 2022) ("We review preserved objections to the wording and form of instructions for abuse of discretion.").

Defendant's third perfunctory claim is that the district court should have taken language from the defense instruction that "emphasized implanting a criminal design in his mind through undue appeal to sympathy, manipulation, and excessive pressure, even if subtle." [Br. 42]. The notion that this precise wording or a variation

---

[4] In its opinion in this case, the Court should avoid any suggestion that a district court must recite the *Gamache* factors in its instructions. It appears the district court threw the defense a last-minute bone here, but this gesture should not be transformed into circuit law.

on it is mandated is frivolous, which could explain why defendant cites no authority for it. There was no abuse of discretion here. *See Correia*, 55 F.4th at 41.

Defendant's final perfunctory claim is that the district court erred by not adopting alleged text in the defense instruction to the effect that "the fact that [he] visited adult prostitutes before is not sufficient to prove beyond a reasonable doubt that he would have been predisposed to agree to the visit without the agent's coaxing." [Br. 42]. The defense instruction did not contain that language [JA: 29-30], and it would not have been an abuse of discretion to omit it even if it had been requested. *See Correia*, 55 F.4th at 41.

In sum, the entrapment issues are specious even if deemed preserved. Further, given the overwhelming evidence of defendant's guilt, the fact that the district court thoroughly instructed on entrapment, and the fact that the focus of the actual defense was on the "rescue" theory and not on entrapment, there is "little reason to think that the precise phrasing of the [entrapment] instruction affected the outcome." *United States v. Alzate*, 70 F.3d 199, 201 (1st Cir. 1995).

## D.    The reasonable doubt instruction claim

Defendant argues [Br. 44-46] the district court was required to use language from the reasonable doubt instruction this Court upheld in *Cleveland*, and in particular the words "strict and heavy burden," "a probability, though a strong one"

is not enough, and "suspicion or conjecture" do not suffice. *Cleveland*, 106 F.3d at 1062-63.

The decisive response is found in *Cleveland* itself: "The Supreme Court has stated that the Constitution does not require district courts to define reasonable doubt, nor does it require trial courts who do choose to explain the term to employ 'any particular form of words ... in advising the jury of the government's burden of proof.'" *Id*. at 1062 (quoting *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)); *accord United States v. Melo*, 954 F.3d 334, 350 (1st Cir. 2020); *United States v. Jones*, 674 F.3d 88, 94 (1st Cir. 2012); *United States v. Fields*, 660 F.3d 95, 96 (1st Cir. 2011) (collecting cases). That should end the matter.

If more were needed, the district court gave a fulsome charge on reasonable doubt, describing it as "a cardinal principle of our system of justice" and "a heavy burden." [JA: 1043]. There was no abuse of discretion, *see Correia*, 55 F.4th at 41, in the omission of the words "strict and" before "heavy burden" or in the failure to use other phrases from the district court instruction quoted in *Cleveland*. Were the Court to hold otherwise, it would effectively mandate the use of precise wording, in direct contravention of *Victor*.

**III.** **The claim that the district court erroneously limited the defense expert's testimony is waived, and there was no abuse of discretion or prejudice in any event**

### A.    Introduction

Defense counsel repeatedly told the district court that he had no intention of eliciting from the defense expert an opinion that defendant lacked the intent to have sex with a minor on the day of the offense, so his claim on this point is waived. There was no abuse of discretion anyway because defendant's argument misreads the case law. Nor was there any prejudice.

### B.    Procedural history

On September 20, 2024, defendant moved *in limine* to admit the testimony of psychiatrist Dr. Frederick Berlin on two main points: (1) "to educate the jury about mental health conditions and behaviors commonly seen in adults who are sexually interested in minors"; and (2) to opine that, "[b]ased on [his] psychiatric assessment [of defendant] and review of case materials . . . [defendant] does not have a psychiatric disorder clinically associated with a sexual interest in children." [JA: 38; *see also* JA: 43 (stating Berlin would testify that defendant's "behaviors are inconsistent with a sexual interest in minors")]. Notably, defense counsel agreed that "[n]one of [Berlin's] testimony would comment on [defendant's] intent on November 2, 2022; that question is, of course, for the jury to decide." [JA: 43].

The same day, the government filed its own motion *in limine* seeking to preclude Berlin's testimony based in part on Fed. R. Evid. 704(b). [JA: 86].[5]

In an "Expert Disclosure" filed on September 23, the defense narrowed the subject matter of Berlin's intended testimony to the two topics noted above, and also stated he would testify relatedly that defendant "has an ongoing sexual interest only in adult women." [JA: 169-171].

On September 25, defendant opposed the government's motion *in limine*, while once again confirming that Berlin's testimony would be cabined to the topics just mentioned and stating that "much like he will not be asked to comment on [defendant's] credibility or intent on the day of the incident, Dr. Berlin will not be asked to relay [defendant's] version of the events to him." [JA: 209].

At an October 2 pretrial conference, defense counsel again proffered Berlin's testimony as encompassing the two main areas discussed above and the related point that defendant was only sexually interested in adult women. [JA: 252, 256]. Defense counsel "concede[d] that there are portions of [Berlin's] report that are inadmissible" and once more agreed that Berlin "cannot testify to what he thinks [defendant's]

---

[5] That rule provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), but that: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b).

intent was on the day of the incident." [JA: 255]. The government signaled it would have no objection to the testimony as narrowed but noted a concern with any testimony to the effect that: (1) defendant did or did not possess certain types of pornography, since Berlin lacked personal knowledge here; and (2) defendant was only sexually interested in adult "women," when in fact there was evidence he was interested in transgender persons as well. [JA: 257-261]. Defense counsel disclaimed any intent to elicit testimony on the first subject [JA: 258], and he agreed that Berlin could couch his testimony in terms of defendant's "interest in adults" to address the second concern [JA: 261-262]. Counsel noted his perception that the parties were "very close" to "agreeing on the scope of [Berlin's] testimony" and that "we can hash that out." [JA: 262]. The court encouraged the parties to do so and noted its "understanding [that] it's going to be three particular areas that Dr. Berlin's testimony will be about, and they don't really go to the ultimate issue." [JA: 262]. Defense counsel replied: "I agree." [JA: 262].

At an October 4 pretrial hearing, defense counsel agreed with the district court that Berlin's testimony would only cover "three areas," and he described them as follows:

[1] one, more general education to the jury about mental health conditions, behaviors, what have you, that are commonly seen with or associated with people who have a sexual interest in children, and then [2] the results of his psychological evaluation and examination of Dr. Quraishi, that he does not possess any of those particular mental health

conditions or behavior patterns and that he has sexual interest only adults, and that [3] there is nothing in the case materials that he reviewed that would indicate a sexual interest in children.

[JA: 304]. Counsel then confirmed: "I think those areas that I identified, that's the scope of his testimony." [JA: 305].

Consistent with the defense narrowing of the scope of Berlin's testimony, later that day the district court entered a text order reflecting the agreed-upon limits:

> Dr. Berlin is precluded from offering testimony that the Defendant did not intend to have sex with a minor, however he may offer testimony to educate the jury about persons with mental health conditions and behaviors that are common in individuals who have a sexual interest in children. He may also testify on the results of his psychological evaluation and examination of the Defendant. Dr. Berlin may offer testify [sic] related to the Defendants [sic] interest in adults. The defense must exercise care in eliciting such testimony to avoid opening an unwanted door.

[JA: 12, 221].

At the third trial day on October 9, Berlin duly testified—at great length—on all three subjects. [JA: 842-887]. On the key topic, Berlin testified somewhat guardedly that he "had no evidence that [defendant] has an *enduring sexual interest* in children, pedophilia, ephebophilia or any of the other[] [diagnoses] that I mentioned earlier" and that "his sexual interest is in adults." [JA: 860-861 (emphasis added)]. On cross-examination, Berlin conceded defendant "had a high sex drive" but said this "was being expressed through repeated interest in adult activities." [JA: 878]. On redirect, Berlin summed up his opinion this way: "I said with reasonable

39

medical certainty this is a man who's sexually interested in adults. I could not conclude with reasonable medical certainty that this was a man who was sexually interested in children." [JA: 887].

The defense later mined Berlin's testimony in its closing argument to the jury. [JA: 1020-1022, 1027].

### C.     The appellate claims are variously waived and meritless

The crux of defendant's appellate position is that the district court erred because "[1] the Court prohibited Dr. Berlin from testifying as to whether [defendant] intended to have sex with a minor or [2] from any discussion that could go to [his] thought process or intent on the day of the offense." [Br. 49].

The first claim is waived many times over. Defense counsel repeatedly stated he had no intention of eliciting testimony from Berlin to the effect that defendant did not intend to have sex with a minor on the day of the offense, and that he only wished to cover the three areas that he ultimately *did* explore with Berlin. [*Supra* 36-39]. The district court's October 4 text order merely reflected and ratified a self-imposed limitation that defense counsel expressly agreed to orally and in writing without any evident qualms. [*Supra* 39]. If these serial affirmations do not amount to waiver, nothing does. *See, e.g.*, *United States v. Valdez*, 88 F.4th 334, 343 (1st Cir. 2023); *United States v. Monson*, 72 F.4th 1, 13 (1st Cir.), *cert. denied*, 144 S. Ct. 367 (2023); *United States v. Chen*, 998 F.3d 1, 6 (1st Cir. 2021).

The second claim is groundless. The text order did not bar "any discussion [by Berlin] that could go to [defendant's] thought process or intent on the day of the offense." [Br. 49]. Quite the contrary, that was the *whole point* of Berlin's extensive testimony: to try to establish that defendant had no sexual interest in children and was only sexually interested in adults, and that hence he likely had no intent to have sex with a minor on the day of the offense. [*Supra* 39-40; JA: 842-887]. In asserting otherwise, defendant passes over Berlin's actual testimony in silence, likely because he sees it refutes his contention here. [Br. 47-54].

There could be no abuse of discretion here anyway because even the Seventh Circuit decision on which defendant places greatest reliance recognizes that, under Fed. R. Evid. 704(b), "[t]he [defense] psychologist could not have been permitted to testify that the defendant did not intend to have sex with [an agent posing as a minor as part of a sting] but he could have testified that it was unlikely, given the defendant's psychology, that he would act on his intent." *United States v. Gladish*, 536 F.3d 646, 650 (7th Cir. 2008). The problem in *Gladish* was that the expert was barred from testifying concerning psychological traits in the defendant that led the expert to believe he only sought "sexual gratification in Internet chat rooms and in watching pornographic films" and that he avoided real sexual encounters for fear of rejection, making it unlikely he intended to have sex with the fictitious minor. *Id*. at 650. That is the very type of testimony defendant was permitted to elicit here, to the

effect that he was only sexually interested in adults and not minors, supporting an inference—however weak—that he did not intend to have sex with a minor on the day of the offense. And this is also why the D.C. Circuit opinion defendant cites is distinguishable, because in that case Berlin himself was precluded from testifying altogether and was specifically prevented from opining that the defendant "was a fantasist with no real sexual interest in children." *United States v. Hite*, 769 F.3d 1154, 1169 (D.C. Cir. 2014).[6]

It is certainly true that this Court has "held time and again that although Rule 704(b) bars a witness from characterizing the defendant's intent, ... it does not ... apply to predicate facts from which a jury might infer such intent." *United States v. Soler-Montalvo*, 44 F.4th 1, 14 (1st Cir. 2022) (reversing exclusion of expert testimony that defendant did not fit the profile of a sexual predator). But defendant was given wide leeway to present *just such predicate facts* through Berlin's expert testimony, so there can be no claim of an abuse of discretion here.

### D.    There was no prejudice

Regardless, there is no basis for holding that, had Berlin expressly testified that defendant had no intent to have sex with a minor on the day of the offense, such

---

[6] Nor does defendant's reliance on *Diaz v. United States*, 602 U.S. 526 (2024), advance the ball, because the holding there was simply that "[a]n expert's conclusion that 'most people' in a group have a particular mental state is not an opinion about 'the defendant' and thus does not violate Rule 704(b)," *id*. at 538.

testimony likely would have altered the verdict. *See Soler-Montalvo*, 44 F.4th at 19. The evidence that this was precisely his intent that day was overwhelming. [*Supra* 1-5]. Moreover, there is no indication in the record that, in the end, Berlin would have even been willing to go that far in his testimony. To the contrary, the testimony he actually gave was quite qualified [*supra* 39-40], strongly suggesting he would not have offered a definitive opinion that defendant had no intention "to have sex with a minor" [Br. 49] that day. And had Berlin ultimately delivered such fanciful testimony, the jury almost certainly would have rejected it as risible in light of the offense facts.[7]

---

[7] Although defendant briefly complains of "cumulative" error [Br. 54], that doctrine does not apply here because there were no errors, let alone errors with a synergistic relationship: "While trial errors which in isolation appear harmless may have a cumulative effect so prejudicial as to require reversal, the operation of that principle depends on the existence of two or more errors. By definition, cumulative-error analysis is inappropriate when a party complains of the cumulative effect of non-errors." *United States v. Stokes*, 124 F.3d 39, 43 (1st Cir. 1997).

## CONCLUSION

For these reasons, the government respectfully requests that the Court affirm

the judgment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:   /s/ *Donald C. Lockhart*
DONALD C. LOCKHART
Assistant U.S. Attorney

**CERTIFICATE OF COMPLIANCE WITH**
**Rule 32(a)**


**Certificate of Compliance with Type-Volume Limit,**
**Typeface Requirements, and Type-Style Requirements**

1.    This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,931 words (an opening or answering brief may not exceed 13,000 words, a reply brief may not exceed 6,500 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(f) (*i.e.*, the corporate disclosure statement, table of contents, table of citations, addendum, and certificates of counsel).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2019.

            */s/ Donald C. Lockhart*
            DONALD C. LOCKHART
            Assistant U.S. Attorney

            Dated:  June 12, 2025

## CERTIFICATE OF SERVICE

I, Donald C. Lockhart, Assistant U.S. Attorney, hereby certify that on June 12, 2025, I electronically served a copy of the foregoing document on the following registered participant of the CM/ECF system:

Kelly C. Quinn, Esq.
Werksman Jackson & Quinn LLP
888 West Sixth Street, Fourth Floor
Los Angeles, CA 90017

 /s/ *Donald C. Lockhart*
DONALD C. LOCKHART
Assistant U.S. Attorney